IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DAVE THOMAS. | : | |
| (AIS #104278), | : | |
| Plaintiff, | : | |
| vs. | : | |
| | : | CIVIL ACTION 17-0318-CG-N |
| ALFIE PACHEO *et al.*, | : | |
| Defendants. | : | |
| | : | |

**REPORT AND RECOMMENDATION**

Plaintiff Dave Thomas, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72(a)(2)(R), and is now before the undersigned on Defendants' Motion for Summary Judgment (Docs. 29, 30, 34). After careful review of the pleadings, and for the reasons set out below, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED**, and Plaintiff Thomas' federal claims be **DISMISSED** with prejudice.

Furthermore, Plaintiff Thomas is hereby placed on **Notice** by the filing of this Report and Recommendation of the Court's **intention to recommend the granting of summary judgment for Defendant Calvin Wilson**, who has not been served with this complaint to date.

It is further **ORDERED** that for the reasons stated in this Report and Recommendation, Plaintiff's Motion to Amend Complaint (Doc. 57) is **DENIED**, and Plaintiff's Motion to Compel Discovery is **DENIED** (Doc. 58).

# I.       Summary of Allegations.

Plaintiff Thomas brings this action against Lieutenant Alfie Pacheo, Corrections Officer Calvin Wilson,[1] Warden Cynthia Stewart, Corizon Health Care, Nurse Charlene Kilpatrick, Director of Nursing at Fountain Correctional Facility Jacqueline Simmons, and Dr. Karen Stone for lack of security and denied or delayed medical treatment following an inmate assault while incarcerated at J.O. Davis Correctional Facility.[2]  According to Thomas, he was awakened from his sleep at approximately 1:00 a.m. on March 2, 2016,[3] when inmate Mark Melvin poured a mixture of hot baby oil and shaving powder on his face.  (Doc. 1 at 6).  Thomas ran from his dorm to inform an officer of the attack, as there was no guard in his dorm at the time of the incident. (*Id.*).  Officers Calvin Wilson and Alfie Pacheo (the only two officers assigned to J.O. Davis Correctional Facility that night to supervise 400 inmates) were talking in the shift office.  (*Id.*). Thomas states that Officer Calvin Wilson asked "who did this" and immediately began to search for inmate Melvin.  (*Id.*).  Thomas then ran to the bathroom and attempted remove the mixture from his face, neck, and shoulder area but alleges as he rubbed the mixture skin pulled off and due to the oil, the mixture could not be completely removed with water.  (*Id.*).  Thomas claims he repeatedly asked to be taken to the hospital for medical treatment but was refused; specifically, Thomas claims Officer Pacheo stated, "I can't take you to the hospital, nor can I call an ambulance,

---

[1]       To date, Corrections Officer Calvin Wilson has not been served with this suit and has not filed an answer to the allegations against him.

[2]       Plaintiff Thomas is now incarcerated at Fountain Correctional Facility.

[3]       In his pleadings, Plaintiff Thomas describes the incident at issue as having occurred on March 1, 2016, at approximately 1:00 a.m.  The record evidence, however, supports that the assault incident subject of this complaint occurred on March 2, 2016 at 1:30 a.m.  Taking the pleadings in total, including cross referencing weekdays provided with a 2016 calendar, the undersigned is confident that the inmate attack transpired in the early morning hours of March 2, 2016. Accordingly, this report and recommendation will refer to the date of the incident as March 2, 2016, rather than the apparent inadvertent scrivener's error of March 1, 2016 detailed in Plaintiff's complaint.

I can only take you to the medical unit at Fountain (G.K. Fountain correctional Facility's medical unit), then I have to come back here," and Officer Wilson made similar statements. (*Id*. at 7). The officers placed the prison on lockdown and brought inmate Melvin in for questioning regarding the incident. Approximately 30 minutes after the incident, Thomas contends Officer Wilson transported him to G.K. Fountain Correctional Facility for medical treatment. (*Id*. at 7-8).

In his complaint, Thomas alleges that he suffered second and third degree burns from the incident, was denied immediate hospital treatment, and received "very basic of pain medications". (*Id*. at 8). Additionally, Thomas claims he was not examined by a doctor for two days and that once examined by Dr. Karen Stone, "she immediately stated, 'Get him to a hospital for immediate medical treatment.' . . . 'I am not going to lose my job.'" (*Id*. at 8). Thomas further claims that once transported to an outside medical facility, two days after the incident, skin grafts were performed, and proper pain medication was prescribed. (*Id*.).

Thomas is suing Defendants in their official and individual capacities and seeks rmonetary relief in the amount of $350,000.00 for compensatory damages and $350,000.00 for punitive damages. (*Id*. at 13; Doc. 47 at 1).

**II. Procedural History.**

Thomas filed this action in July 2017. (Doc. 1). Defendants, with the exception of Correctional Officer Calvin Wilson, have answered the suit denying the allegations against them (docs. 33, 35) and filed special reports in support of their position. (Docs. 34, 36). The Court entered an order notifying the parties that Defendants' Answer and Special Reports were being converted into a Motion for Summary Judgment and giving them an opportunity to file briefs and materials in support or opposition. (Doc. 42). Thomas has objected to the Motion for Summary

Judgment (Doc. 56) and has filed a Motion to Amend Complaint (Doc. 57) and Motion to Compel Discovery (Doc. 58).

In his **Motion to Amend Complaint**, Thomas seeks to add a defendant to his suit, Jefferson Dunn, Commissioner of the Alabama Department of Corrections, for failure to train employees and failure to protect inmates. (Doc. 57). This motion is hereby **DENIED**, for the reasons stated in this report and recommendation[4] and that Thomas fails to connect the actions, customs, or policy of Jefferson Dunn to the incident subject of this action.[5]

The Court further denies Thomas' Motion to Compel Discovery. (Doc. 58). In his motion to compel discovery, Thomas resubmits his previous request for documents and further requests: (1) copies of the "shift log" at J.O. Davis Correctional Facility to evidence the number of officers present at the time of the incident and to determine the amount of time Thomas was denied medical treatment, (2) free-world hospital medical records, and (3) a copy of prison administrative regulations. (*Id*.). The undersigned determines that, in light of the evidence submitted through

---

[4]     As discussed herein, the court finds no constitutional violation has occurred related to the March 2, 2016 incident subject of this complaint.

[5]     As presented, Thomas alleges Jefferson Dunn is responsible as a supervisor for alleged constitutional violations. Such a claim is rooted in theory of *respondeat superior* and is not cognizable in a § 1983 action. *Edwards v. Ala. Dep't of Corrs.*, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support [a] § 1983 claim. . . ."); *see also Duff v. Steubb*, 378 F. App'x 868 (11th Cir. 2010) ("Deliberate indifference can be based on the defendant's personal participation in the allegedly unconstitutional conduct or on the defendant's actions as a supervisor."). Supervisory liability is only actionable where the supervisor participated in the alleged unconstitutional conduct or when there is a causal connection between the actions of the supervisor and the alleged deprivation. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). Furthermore, where supervisory liability is based on a supervisor's custom or policy, a plaintiff must show that the custom or policy was "the 'moving force [behind] the constitutional violation.'" *Pinkney v. Davis*, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted). Thomas has posited insufficient allegations and facts connecting Dunn to an unconstitutional policy or custom regarding failing to train or failing to protect (the conclusory allegation that three similar assaults occurred over a six-year time span is simply insufficient to establish a "trend" or custom or support a claim of failing to protect and train). (Doc. 57 at 1).

the special reports and that at this stage of the proceedings, Plaintiff Thomas' version of the facts are accepted as true unless contradicted by the record, there is no need for further discovery at this time. For these reasons, Plaintiff's **Motion to Compel Discovery** is hereby **DENIED**. (Doc. 58).

Accordingly, the Motion for Summary Judgment is ripe for consideration.

### III.    Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the

nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc.*, 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." *Garczynski*, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id.* In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court [*6] should not adopt the contradicted allegations." (citations omitted) (unpublished)).

**IV.    Discussion.**

For purposes of clarity, the Court has regrouped the claims in Thomas' complaint based on the facts, allegations, and defenses contained in the parties' pleadings.  The Court will now discuss each in turn.

>    **A.    The PLRA Bars Plaintiff's Claim Against Defendants Because Plaintiff Failed to Exhaust His Administrative Remedies.**

In their Motion for Summary Judgment, Defendants argue that Thomas is barred from bringing this action due to his failure to exhaust administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA").  The PLRA states that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  "Section 1997e(a) is intended to force inmates to give authorities a chance to correct constitutional violations before resorting to federal suit and to prevent patently frivolous lawsuits." *Horne v. Nevil*, 2017 WL 9486058 at *4, 2017 U.S. Dist. LEXIS 44613 at *9 (S.D. Ga. March 7, 2017).  "Congress has provided in §1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies."  *Booth v. Churner*, 532 U.S. 731, 741 n.6, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001).  Further, the exhaustion requirement of the PLRA "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002), and is required even if the available administrative remedies are futile or inadequate.  *Harris v. Garner*, 190 F.3d 1279, 1285-86 (11th Cir. 2005).

Exhaustion of all available administrative remedies is a precondition to litigation and is mandatory. *See Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1853, 195 L. Ed. 2d 117, 120 (2016) ("That mandatory language means a court may not excuse a failure to exhaust, even to take "special circumstances" into account.); *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."). The Supreme Court has noted that each prison sets its own administrative remedies, *Jones v. Bock*, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007), and that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90-91. Thus, prisoners must go beyond merely filing a grievance and are required by the PLRA's exhaustion requirement to "properly take each step within the [prison's] administrative process," including appealing denials of relief. *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005).

> In order to determine whether Plaintiff fully exhausted his available administrative remedies, the Court thus first examines and consider [sic] both the Defendants' and the Plaintiff's version of the facts, taking the Plaintiff's version of the facts as true. *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). "If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id.* If the complaint is not subject to dismissal at the first step, then the court shall proceed to make specific findings in order to resolve disputed factual issues related to exhaustion. *Id.* The defendants bear the burden of pleading and proving that the plaintiff has failed to exhaust available administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007).

*Shepard v. Fla. Dep't of Corr.*, 2017 U.S. Dist. LEXIS 53046 at *24-25 (S.D. Fla. Apr. 5, 2017).

The Supreme Court has specified three "circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross*, 136 S. Ct. at 1853. First, "an administrative procedure is unavailable when (despite what regulations or guidance

materials may promise) it operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, a grievance process is rendered unavailable "when prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation." *Id.* at 1860. The law is also well settled that "the question of exhaustion under the PLRA [is] a 'threshold matter' that [the court must] address before considering the merits of the case." *Myles v. Miami-Dade Cnty. Corr. & Rehab. Dep't*, 476 F. App'x 364, 366 (11th Cir. 2012) (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004)).

The Eleventh Circuit has set out a two-part test to determine whether or not a suit may be dismissed for failure to exhaust administrative remedies. *See Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). First, a court "looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, take the plaintiff's version of the facts as true. If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id.* at 1082. If the complaint is not subject to dismissal, then the court "proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion." *Id.*

In the current action, Defendants have submitted that upon arriving at any facility operated by the Alabama Department of Corrections, inmates, such as Thomas, are notified of the procedures and processes for obtaining medical care and prescribed medications. The form utilized by the Fountain medical staff is entitled "ACCESS TO CARE". (Doc. 36 at 4). The ACCESS TO CARE form sets out that an inmate experiencing a non-emergency medical or health problem and/or complaint at any correctional facility is directed to submit a sick call request form

in order to bring this problem or complaint to the attention of the medical staff and/or request medical treatment for this problem. For inmates housed in general population areas, sick call request forms are available at the Health Care Unit and outside the shift office. (*Id*.). Additionally, [i]nmates at Fountain are well-aware of and utilize the grievance process to voice a complaint regarding any medical . . .treatment sought or received during their incarceration at Fountain." (*Id*. at 7). Defendants explain this procedure as follows:

> The grievance process is initiated when an inmate submits a Medical Grievance form to [the Health Services Administrator (HSA)] through the locked sick call box or the institutional mail system. After reviewing Medical Grievance, [the HSA or her designee] then provide[s] a written response [to the grievance] within approximately ten (10) days of receipt of the Inmate Grievance. The written response to a Medical Grievance is included on the bottom portion of the same form containing an inmate's Medical Grievance. Below the portion of the form designated for the "Response," the following notation appears:

> As stated in the Medical Grievance forms, the second step of the grievance process involves the submission of a Medical Grievance Appeal. The Medical Grievance form includes instructions to the inmates on how to submit a Medical Grievance Appeal. After completing a Medical Grievance Appeal, an inmate may provide it to [the HSA], place it in the box for sick call request slips, or give it to the nurse conducting rounds in segregation. Following submission of the Medical Grievance Appeal, the inmate may be brought in for one-on-one communication with the medical staff, [the Director of Nursing ("DON") or the Health Services Administrator]. A written response to a formal Grievance Appeal is provided within approximately ten (10) days of receipt. Medical Grievance and Grievance Appeal forms are available from the Health Care Unit and the correctional shift commander office at Fountain. Inmates are instructed to place completed Medical Grievance and Grievance Appeal forms in the sick call boxes located outside of the shift office. [The HSA or DON] review the grievances daily, provide a written response within approximately ten (10) days at the bottom of the form and return a copy of the completed forms to the inmate. [The Health Services Administrator] encourages inmates who have complaints about the medical care they have sought or received at Fountain to utilize this grievance process.

(Doc. 36 at 8-9). Defendants contend that Thomas "has not submitted any Medical Grievance Appeals concerning any issues whatsoever" and such noncompliance with the well-known and

clearly mandated grievance procedure entitles correctional defendants to immediate dismissal of this action. (Doc. 36 at 30).

Thomas does not dispute that he failed to exhaust administrative remedies or ever file a grievance. Rather, he argues in his opposition to summary judgment that the filing of a grievance would have been futile in obtaining help given the urgent and immediate attention required for his skin burns. (Doc. 56 at 1). Under the PLRA, however, "there is no urgent medical need exception for the exhaustion requirement." *Riffey v. Lappin*, No. 1:09-2089-PMD-SVH, 2010 U.S. Dist. LEXIS 99486, *11 (D.S.C. July 27, 2010) (citing *Dudley v. Bureau of Prisons*, CIV 08-4022, 2009 U.S. Dist. LEXIS 24001 (D.S.D. Mar. 24, 2009) (no exception recognized in Eighth Circuit to PLRA for urgent medical need); *see also Rivera v. Pataki*, 01 CIV 5179 (MBM), 2003 U.S. Dist. LEXIS 11266, *22-23 (June 25, 2003) (holding no exception to exhaustion requirement for urgent medical needs) (citing *Booth v. Churner*, 532 U.S. 731, 741, n.6 (2001) ("We stress the point that we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.")); *Arbuckle v. Bouchard*, 92 F. App'x 289 (6th Cir. 2004) (The PLRA does not excuse exhaustion for prisoners who are under imminent danger of serious physical injury); *Massey v. Helman*, 196 F.3d 727 (7th Cir. 1999) (No futility exception to the PLRA's exhaustion requirement). Exhaustion is mandatory in all cases, despite the presence of medical exigent circumstances. Consequently, Defendants must be dismissed from this suit without prejudice.

### B. No Eighth Amendment Violation.

Even if Thomas had exhausted his claims against Defendants, Defendants are entitled to summary judgment on Thomas' Eighth Amendment claims because Thomas has failed to carry his burden of showing Defendants acted with deliberate indifference to his safety or medical needs.

**1. Denial of Medical Care.**

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). In *Sims v. Mashburn*, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

*Sims*, 25 F.3d at 983 (citing *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d (1992)).

To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 n. 9 (2002)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need.

*Farrow*, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. *Estelle,*

429 U.S. at 106; *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting *Farmer* and *Estelle,* this Court explained in *McElligott* that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott,* 182 F.3d at 1255; *Taylor,* 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

*Farrow*, 320 F.3d at 1245-46.

Defendants contend that Thomas received adequate medical care and have submitted a

copy of Thomas' Alabama Department of Corrections' medical records which document the

medical treatment he received during the relevant period. A summary of said records is as follows:

> Thomas was examined in the health care unit of Fountain Correctional Center on March 2, 2016 at 1:45 a.m., for burns to his cheeks, tip of nose, left-side of lip, and the left-side of neck. (Doc. 34-8 at 15). The skin was described as cool, red, and blistered with clear drainage. (Doc. 34-8 at 13). The burned areas were cleaned, silver sulfadiazine cream was applied topically to the burned skinned,[6] dressings were applied to the wounds, Ibuprofen 650 mg was given as need for discomfort, and Thomas remained in the hospital ward for observation and to be examined by the doctor the following day. (Doc. 34-4 at 1). The nursing notes indicate that Thomas was reexamined no less than six times on March 2, and at no time showed signs of distress or a worsening of his condition. (Doc. 34-8 at 11).

> The next day, March 3, 2016, Thomas was treated with an IV, Ensure for nutrition, Tylenol #3 (acetaminophen and codeine), Ibuprofen 200, and Silver Sulfadiazine.

---

[6] Silver Sulfadiazine cream is used "to help prevent and treat wound infections in patients with serious burns. Silver sulfadiazine works by stopping the growth of bacteria that may infect an open wound. This helps to decrease the risk of bacteria spreading to surrounding skin, or to the blood where it can cause a serious blood infection (sepsis). Silver sulfadiazine belongs to a class of drugs known as sulfa antibiotics." Silver Sulfadiazine Cream, WebMD, https://www.webmd.com/drugs/2/drug-13530/silver-sulfadiazine-topical/details (last visited 3/8/2019).

His wounds were again cleaned and debride twice a day and redressed. (Doc. 34-8 at 2-3). The nursing notes indicate that Thomas' condition did not change and at no time did Thomas show signs of distress. (Doc. 34-8 at 11-12). Dr. Stone examined Thomas and entered orders for his transfer to the USA Emergency Room on March 4, 2016, to be evaluated by the burn team. (Doc. 34-8 at 1).

On March 4, 2016, Thomas was evaluated at University South Alabama's Burn Center ("Burn Center") where he was diagnosed with 2.5 % total body surface area second and third degree burns to the face, neck, and left shoulder. (Doc. 34-9 at 47). The wounds were described and pink and blanching on the face and neck and white and nonblanching on the left shoulder. (*Id*). The wounds were cleaned, debrided, and dressed in Silvadene and sterile gauze. No complications were noted. (Doc. 34-9 at 47). The burn team specialist's prescribed Silvadene to be applied wounds daily and Tylenol 3 and Advil were prescribed for management of pain. (Doc. 34-9 at 53). It was further ordered that Thomas return for a follow up appointment on March 8, 2016 (Doc. 34-9 a t 88-89).

Thomas returned to the Burn Center on March 8, 2016, where his burns were again cleaned, antibacterial cream was applied, and dressings changed. A Burn Center physician determined after examination that a skin graft should be performed for the burn on Thomas' left shoulder and recommended said surgery within a week's time. (Doc. 34-8 at 131; Doc. 34-9 at 45-46; Doc. 36-1 at 9).

Dr. Stone examined Thomas on March 9, 2016, and no complications were noted, orders were continued for antibacterial cream to be applied to Thomas' burns, and new orders were entered for Percocet for Thomas' complaints of pain. (Doc. 36-5 at 20, 75).

On March 15, 2016, Thomas underwent a surgical procedure at the University of South Alabama Hospital to graft skin from his left thigh to the site of the burn on his left shoulder. (Doc. 34-9 at 31; Doc. 36-5 at 215-218). Thomas was admitted to the hospital for overnight observation and discharged on March 16, 2016, with orders of daily wound care, including dressing changes and application of antibacterial ointment, as well as Percocet for pain and Colace for constipation. (Doc. 34-9 at 35; Doc. 36-5 at 216).

Upon Dr. Stone's March 17, 2016 examination, Thomas' skin graft appeared to be successful with no signs of infection or complication. Percocet was prescribed for pain (325 mg every 6 hours as-needed) through April 2, 2016 for discomfort. (Doc. 36-5 at 73).

On March 18 and 21, 2016, Thomas was seen for post-operative evaluations at the Burn Center and no recommendations or changes to care were ordered but to apply antibiotic ointment to graft sites. (Doc. 34-9 at 26).

Dr. Stone followed up with Thomas on March 23, 2016, and observed that the grafts were healing well, without complication or infection, and orders for daily cleaning were continued. (Doc. 36-5 at 74).

On March 28, 2016, Thomas was examined at the Burn Center, where it was noted that his wounds were healing as expected and Ibuprofen was recommended for pain. (Doc. 34-8 at 21). Thereafter, Thomas was discharged from the prison infirmary with prescriptions for Peridex and Bactroban and ordered to return to the health care unit daily for would care. (Doc. 34-8 at 1, 16-20, 29).

For purposes of this motion, the Court assumes that Thomas' sustained burns from the assault are considered a serious medical need. Thus, to establish a constitutional claim Thomas must show that Defendants acted wantonly, with deliberate indifference to his serious medical needs, *see Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298-99, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991); *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1425 (11th Cir. 1997); however, Thomas fails to show that the medical treatment he received was so grossly inadequate "as to amount to no care at all." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) ("A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."); *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause.").

The record belies Thomas' claim that he was denied medical treatment and, instead, supports that Thomas received ample medical care, including immediate wound care and observation, prompt approval of specialist appointments and surgeries,[7] placement in the prison

---

[7]     (Doc. 34-8 at 1, 34-9 at 31, 40, 48).

infirmary, and pain management medication. Indeed, every order of the specialists were followed upon return to the prison, complaints of pain were answered with stronger prescription medications, and Thomas was constantly monitored to assess his healing. There are simply no facts in the record indicating that Thomas was ever denied any medical need or treatment.

### 2. Delay of Medical Care.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." *Hill*, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Id.*

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

*Hill*, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted).

Accordingly, to succeed in proving that the delay rose to a constitutional violation, Thomas "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. . . . Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." *Hill*, 40 F.3d at 1188-89 (internal

citations omitted) (footnotes omitted); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).

Lieutenant Alfie Pacheo ("Lt. Pacheo") declares by affidavit that on March 2, 2016, at approximately 1:30 a.m., Thomas entered the shift office "yelling" and holding his hands near his face, and Lt. Pacheo and Officer Wilson questioned Thomas about the incident. (Doc. 34-3 at 1). Thomas explained that "a hot liquid was thrown on his [] face" by Inmate Mark Melvin. (*Id*.). Lt. Pacheo affirms that at this time, Thomas showed no signs of tissue damage, and Lt. Pacheo instructed Thomas to go wash his face in the lobby bathroom. (*Id*.). Lt. Pacheo proceeded to investigate the incident but was radioed back to the shift office back Officer Wilson. (*Id*.). Upon return to the shift office, at approximately 1:40 a.m., Lt. Pacheo observed that Thomas' skin "had started to peel away from his face", and Lt. Pacheo ordered Officer Wilson to transport Thomas to the Health Care Unit at Fountain Correctional Facility. (*Id*. at 1-2).

At approximately 1:45 a.m., the record confirms that Thomas arrived at Fountain Correctional Facility and was immediately examined by the nursing staff. As previously discussed, his wounds were cleaned, debride, and antibiotic ointment (Silver Sulfadiazine) and dressing was applied. With no physician present, Thomas was held in the infirmary, scheduled to see the doctor the following day. While in the infirmary, Thomas was consistently monitored and never presented with a fever nor did his condition worsen. (Doc. 34-9 at 11-17).

Dr. Stone returned to Fountain Correctional Facility on the afternoon of March 3, 2016, and diagnosed Thomas with second and third degree burns. Dr. Stone ordered: an IV saline drip, ordered cleaning, debridement and dressing changes twice a day, ordered the application of Sivladene, ordered pain medication of Tylenol #3, Ensure, and formally admitted Thomas to the prison's infirmary. Dr. Stone further contacted the burn center at the University of South Alabama

Hospital ("USA") and consulted with members of the staff regarding Thomas' condition and burns. Dr. Stone affirms that the USA burn center providers indicated that they would evaluate Thomas through the emergency room but did not state that Thomas required immediate attention or transport. Dr. Stone did receive instructions from the USA burn center on how to proceed with care and treatment until Thomas could be evaluated and the instructions corresponded with the care being administered by the prison medical staff.[8]  Orders were entered (and immediately approved) for Thomas to be transported the following day, March 4, 2016, to the USA Hospital to be formally evaluated by burn center specialists. The record confirms that Thomas' condition did not worsen from the time he was initially evaluated by the prison medical staff until he was evaluated by the burn center specialists.

As previously discussed, when evaluated by the burn center specialists, Thomas' burns were cleaned, Silvadene antibacterial cream was applied, dressings were changed, and Thomas was scheduled to follow up in three days. (Doc. 34-9 at 47). The specialists ordered that Thomas return for a follow up in three days and prescribed the same treatment that was currently being administered until he returned. (Doc. 34-9 at 53, 88-89). When Thomas returned, the burn specialists determined that a skin graft was the best course of treatment for his left shoulder. (Doc. 34-8 at 131; Doc. 34-9 at 45-46; Doc. 36-1 at 9). The skin graft was scheduled for approximately one week later. While waiting for the surgery, the record confirms that Thomas' condition did not worsen, that he did not show symptoms of infection, including a fever. (Docs. 34-8, 34-9).

Thomas does not allege, and the record does not reflect, that his condition worsened over the two days he waited to be taken to a hospital or while awaiting surgery. *Shapley v. Nevada Bd.*

---

[8]     Contrary to Thomas' allegations, Dr. Stone affirms she never stated, "Get him [Plaintiff] to a hospital for immediate medical treatment," nor did she state, "I am not going to lose my job".

*of State Prison Comm'rs.*, 766 F.2d 404, 407 (9th Cir. 1985) (noting that where there is a "'mere delay in surgery,' a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful.'") (citation omitted).  Specifically, the record confirms that during the period of time lapse between the altercation and when Thomas was taken to the Fountain Correctional Facility health care unit, the defendant officers were concerned with Thomas' needs but did not know the severity of the medical need initially.  Upon knowledge that Thomas' skin was burned, Lt. Pacheo immediately acted and ordered that Thomas be taken for medical treatment, and Officer Wilson transported Thomas for medical care.  The record also confirms that Thomas' received prompt and adequate care at the prison health care unit.  Notably, the prison staff's treatment was affirmed as proper by the burn center specialists ordering continuation of the prison staff's treatment plan.  Additionally, no emergency treatment was ever performed by the burn specialists or indicated as necessary - in fact, the burn specialist allowed Thomas to twice return to the prison for days in between their evaluations/surgery.

Thomas further fails to show how Defendants are responsible for any surgical delay, as the record indicates that Defendants followed every recommendation by the outside surgeons, approved surgical requests and transported Thomas to every scheduled appointment.  Furthermore, the record evidences that his burns healed as expected.

Accordingly, Thomas has failed to produce supporting evidence that any "delays" in the receipt of medical treatment worsened his conditions or were caused by nonmedical reasons.  As such, Thomas may not proceed on his medical deliberate indifference claim, and Defendants are entitled to summary judgment on the deliberate indifference claim.

### 3. Failure to Protect.

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)) (alterations and quotations omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834; *Purcell v. Toombs Cnty.*, 400 F.3d 1313, 1321 (11th Cir. 2005) ("[A] prison custodian is not the guarantor of a prisoner's safety.") (quotation omitted).

To establish a claim of failure to protect, Thomas must show that Defendants knew he was at a serious risk of harm and "disregarded the substantial risk by failing to act in an objectively reasonable way to alleviate the risk," and that the defendants "'acted with a state of mind that constituted deliberate indifference.'" *Estate of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 767 (11th Cir. 2016) (citations omitted).

> In this context, deliberate indifference requires: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence. *[Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010)]; *see also Ray v. Foltz*, 370 F.3d 1079, 1083 (11th Cir. 2004) ("Deliberate indifference is not the same thing as negligence or carelessness."). Thus, a prison official may have subjective knowledge only if he had both knowledge of specific facts from which an inference of risk of serious harm could be drawn, and he actually drew that inference. *Carter[ v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003)]. And, therefore, a plaintiff's claim will fail as a matter of law in the absence of actual knowledge of the substantial risk, because to hold otherwise would impermissibly vitiate the subjective component of the analysis. *See Farmer*, 511 U.S. at 837-38.

*Id.*

In this action, it is undisputed that an Inmate Melvin attacked Thomas during the early hours of March 2, 2016, by throwing a mixture of hot oil and shaving powder on him, causing

second and third degree burns on his face, neck, and left shoulder. It is undisputed that prior to the attack Mark Melvin was not known to be an enemy of Thomas. (Doc. 34-7). It is further undisputed that following the attack, Inmate Melvin was formally validated as an enemy and the two were housed separately. (*Id.*). The record lacks evidence that Defendants (or even Thomas) was aware of a risk of serious harm prior to the attack. Absent a showing that the defendants subjectively knew Melvin posed a substantial risk of serious harm to the plaintiff, he is due no relief. See e.g., *Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) ("[T]he allegations of [plaintiff's] complaint do not show the requisite subjective knowledge of a risk of serious harm, and, thus, do not state a claim for deliberate indifference resulting from a failure to protect from the attack by [a fellow inmate]."); *Chatham v. Adcock*, 334 F. App'x 281, 293-94 (11th Cir. 2009) (where no "specific serious threat" from inmate assailant was report to jail official prior to attack, summary judgment in favor of defendants was appropriate); *McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006) (vague allegations of "problems" with another inmate are insufficient to establish that defendant officers were aware of a specific risk of serious harm). Consequently, summary judgment is due to be granted in favor of Defendants on Thomas' failure to protect claim.

Similarly, Thomas' vague and conclusory allegation that Defendants Pacheo, Wilson, and Stewart failed to provide adequate security also fails.

As previously stated, to satisfy the first prong of a deliberate indifference claim, Thomas must demonstrate "an objectively substantial risk of serious harm." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (internal quotation omitted). This objective risk may be established by alleging facts which show the existence of "an excessive risk of inmate-on-inmate violence at" a prison, an atmosphere where "violence and terror reign" or that there is a "constant threat of violence." *Purcell*, 400 F.3d at 1320. However, "occasional, isolated attacks by one prisoner on

another may not constitute cruel and unusual punishment." *Id.* Thomas has presented no evidence that there is "a history of widespread abuse" to put Defendants "on notice of the need to [provide more officers at night]." *Cottone*, 326 F.3d at 1360 (internal quotation omitted); *but cf., Hale v. Tallapossa Cnty.*, 50 F.3d 1584 (11th Cir. 1995) (unconstitutional conditions of confinement existed where there was a lack of inmate supervision and a substantial risk of serious harm from known violent inmates); *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) (Eighth Amendment violation where prison official failed to ensure adequate supervision and monitoring of inmates where history of inmate-on-inmate violence was known.). And, Thomas has not shown that that the attack by inmate Melvin occurred pursuant to any policy enacted by Defendants or due to any deficiency in security. Consequently, Thomas' constitutional claim of inadequate security fails and summary judgment should be granted in favor of Defendants on this issue.

### C. Thomas Fails to Allege Sufficient Facts to Connect Defendants to the Claimed Constitutional Violations.

#### 1. Defendant Stewart is not Liable under Theory of Respondeat Superior.

Thomas claims that Defendant Warden Cynthia Stewart is responsible, as a supervisory official, for the failure to protect him and the denial and delay of medical treatment. (Doc. 1 at 4). Such a claim is rooted in the theory of *respondeat superior* and is not cognizable in a § 1983 action. *Edwards v. Ala. Dep't of Corrs.*, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory of *respondeat superior* is not sufficient to support [a] § 1983 claim. . . ."); *see also Duff v. Steub*, 378 F. App'x 868 (11th Cir. 2010) ("Deliberate indifference can be based on the defendant's personal participation in the allegedly unconstitutional conduct or on the defendant's actions as a supervisor.").

> "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.

1999) (internal quotation marks and citation omitted); *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *4 (concluding supervisory officials are not liable on the basis of *respondeat superior* or vicarious liability). Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. *Gonzalez*, 325 F.3d at 1235, 2003 WL 1481583, at *5; *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *5 (quoting *Braddy v. Florida Dep't of Labor & Empl. Sec.*, 133 F.3d 797, 802 (11th Cir.1998)); *Brown*, 906 F.2d at 671. Alternatively, the causal connection may be established when a supervisor's "'custom or policy ... result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at 1235, 2003 WL 1481583, at *5 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)); *Hartley*, 193 F.3d at 1263; *see also Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1560-61 (11th Cir. 1993). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at 1234, 2003 WL 1481583, at *4 (internal quotation marks and citation omitted).

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). In instances where supervisory liability is based on a supervisor's custom or policy, a plaintiff must show that the custom or policy was "the 'moving force [behind] the constitutional violation.'" *Pinkney v. Davis*, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted). "[I]t is clear that not only must there be some degree of 'fault' on the part of [defendant] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." Id. (citations omitted).

Defendant Stewart avers she "do[es] not oversee the provision of medical services to inmates in Alabama. [She] was never apprised of any of inmate Thomas' requests for medical care and did not participate in any decisions related in any way to the provision of medical care to Mr. Thomas, including the decision regarding whether inmate Thomas required medical care at a hospital or a consultation with an off-site medical provider. Medical providers on the Fountain

medical staff determine whether inmates such as inmate Thomas require hospitalization or treatment by an off-site medical provider." (Doc. 34-2 at 2). Further, Thomas has not pointed to any facts connecting Defendant Stewart to an unconstitutional policy or custom regarding denying or delaying medical care or failing to protect inmates. Given that Thomas fails to personally link actions of Defendant Stewart to a claim, the undersigned finds that Thomas has failed establish a valid Eighth Amendment claim against Defendant Stewart and summary judgment should be granted in favor of Defendant Stewart.

### 2. Defendant Corizon is not Liable as a Private Corporation.

Defendant Corizon Health Care, Inc. ("Corizon") is a private entity contracted to provide medical services to ADOC prisoners. "For § 1983 liability to attach to a private corporation providing prison medical care to prisoners, it must be shown that a prisoner's constitutional rights were violated as a result of an established policy or custom of that corporation." *Green v. Preemptive Forensic Health Solutions*, 2015 WL 1826191 at *3, 2015 U.S. Dist. LEXIS 52715 at *8 (N.D. Ala. April 21, 2015) (citing *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997)).

A review of the record reveals that Thomas promptly received medical attention when brought to the health care unit. All sick call requests and medical needs were responded to and Thomas fails to allege facts sufficient to show that any written or verbal complaint was ignored. Further, there is no evidence that Corizon has a policy of denying or delaying medical care ,and Thomas fails to allege such in his complaint. Consequently, the undersigned determines that Defendant Corizon should be granted summary judgment on all claims asserted against it.

### IV. Notice of Judgment Independent of the Motion.

Rule 56 of the *Federal Rules of Civil Procedure* permits the Court, after it has given notice and a reasonable time to respond, to "consider summary judgment on its own after identifying for

the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). Thus, by filing of this Report and Recommendation, the Court notifies Plaintiff of its intention to consider a recommendation to the District Judge that he enter summary judgment, *sua sponte*, in favor of Defendant Officer Calvin Wilson on the claims raised against him in this action.

As discussed previously, Plaintiff Thomas alleges that Defendant Wilson is liable for failing to protect him and/or providing inadequate security and for denial and/or delay of medical care on March 2, 2016. Thomas further claimed that Defendant Lt. Alfie Pacheo, as a fellow supervising officer, was liable for these same violations. Thus, in an effort to determine whether or not Plaintiff carried his burden in establishing a constitutional claim, the undersigned has analyzed the aforementioned claims and concluded there to be no cognizable claim pursuant to § 1983. For the reasons stated in this report, after a review of all relevant facts, it is recommended that summary judgment be entered on behalf of Defendant Wilson and dismissal of all claims against him.

However, Defendant Wilson has yet to be served with the complaint and is therefore not a party to this motion for summary judgment. Given that Thomas presents no additional allegations nor provides any differing facts as to his claims against Defendant Wilson than those that have been analyzed *supra*, as to Defendant Pacheo, the Court maintains that its findings of facts and conclusions of law regarding the claims presented against Defendant Wilson would be essentially identical to those discussed in this report. Accordingly, Plaintiff Thoams is hereby put on notice by this report and the analysis of his claims of the Court's intention to consider summary judgment in favor of Defendant Wilson.

Accordingly, within the fourteen days provided for filing objections to this Report and Recommendation, Plaintiff Thomas shall show cause, in writing, why the Court should not enter

summary judgment pursuant to Rule 56(f)(3) of the Federal Rules of Civil Procedure in favor of Defendant Wilson on Plaintiff's 42 U.S.C. § 1983 claims.

In responding to this notice, Plaintiff should refer to Fed. R. Civ. P. Rule 56, including the following provision:

A party asserting that a fact . . . is genuinely disputed must support the assertion by:

> (A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B)   showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Plaintiff cannot rely only on his unsworn pleadings but must respond to this notice by filing sworn affidavits, depositions, or other materials set forth in Rule 56(c)(1)(A) — or by citing such evidence already of record in this matter — which set forth facts presented in a form that would be admissible evidence demonstrating that there is a genuine dispute as to a material fact for trial in this case. If plaintiff fails to file sworn affidavits or other acceptable evidence as set forth in Rule 56 the court will accept the evidence identified above as undisputed, for purposes of evaluating whether the court should grant summary judgment in the defendants' favor. *See* Fed. R. Civ. P. 56(e). Plaintiff's failure to follow the requirements of Rule 56(c)(1)(A) in opposing the proposed summary judgment could result in a recommendation from the undersigned Magistrate Judge to the presiding District Judge that she enter summary judgment in the favor of the Defendant Calvin Wilson and enter final judgment in this case without a trial.

## V.    Conclusion.

Based on the foregoing, it is recommended that Defendants' Motion for Summary Judgment be **granted,** and that Plaintiff Thomas' action against Defendants Pacheo, Stewart, Corizon Health, Inc., Simmons, Kilpatrick, and Stone, be **dismissed** with prejudice.

Furthermore, Plaintiff is hereby placed on **Notice** by the filing of this Report and Recommendation of the Court's **intention to recommend the granting of summary judgment for Defendant Calvin Wilson**, who has not been served with this complaint to date.  Plaintiff is afforded the opportunity to include within any objections he has to this report and recommendation any reasons that should preclude the entry of summary judgment on behalf of Defendant Calvin Wilson.

Additionally, it is **ORDERED** that Plaintiff's Thomas' Motion to Amend Complaint is **DENIED** (Doc. 57) and Plaintiff's Motion to Compel Discovery is **DENIED** (Doc. 58).

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. L.R. 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance

with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**ORDERED** this _7th_ day of June, 2019.

/s/ Katherine P. Nelson

**UNITED STATES MAGISTRATE JUDGE**